*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2001 FED App. 0414P (6th Cir.)
File Name: 01a0414p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

ROBERT A. BUELL,
    *Petitioner-Appellant,*

    *v.*

BETTY MITCHELL, Warden,
    *Respondent-Appellee.*

No. 99-4271

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 95-02415—Paul R. Matia, Chief District Judge.

Argued: January 30, 2001

Decided and Filed: December 4, 2001

Before: BOGGS, SILER, and DAUGHTREY, Circuit
Judges.

———————————

**COUNSEL**

**ARGUED:** Jeffry F. Kelleher, JEFFRY F. KELLEHER &
ASSOCIATES, Cleveland, Ohio, for Appellant. Jon W.
Oebker, OFFICE OF THE ATTORNEY GENERAL OF
OHIO, Cleveland, Ohio, for Appellee. **ON BRIEF:** Jeffry F.
Kelleher, JEFFRY F. KELLEHER & ASSOCIATES,
Cleveland, Ohio, Patricia A. Millhoff, Akron, Ohio, for
Appellant. Stuart A. Cole, OFFICE OF THE ATTORNEY

GENERAL, CORRECTIONS LITIGATION SECTION, Columbus, Ohio, for Appellee.

BOGGS, J., delivered the opinion of the court, in which SILER, J., joined. DAUGHTREY, J. (p. 59), delivered a separate opinion concurring in the judgment.

---

**OPINION**

---

BOGGS, Circuit Judge. Petitioner-appellant Robert A. Buell appeals the judgment of the district court denying his petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. For the following reasons, we affirm.

I

Buell's habeas petition relates to his 1984 conviction and death sentence for the sexual assault and murder of eleven-year-old Krista Lee Harrison. On Saturday, July 17, 1982, Krista and a schoolmate were collecting aluminum cans in a ballpark across the street from Krista's home in Marshallville, Ohio. Krista was kidnapped from the park that day. Six days later, Krista was found dead in a remote area of Holmes County, Ohio. An autopsy revealed that she had been sexually assaulted by the thrusting of a rigid object against the inlet of her vagina and then strangled to death. The remainder of the factual findings of the Ohio Supreme Court related to this case can be found in *State v. Buell*, 489 N.E.2d 795, 798-99 (Ohio 1986).

II

Buell was indicted on November 15, 1983. He received a jury trial. On April 4, 1984, the jury found Buell guilty of aggravated murder and the specification charging Buell as the principal offender who committed the murder of Krista Lee Harrison while kidnapping or fleeing immediately after kidnapping her. The trial court agreed with the jury's

---

**CONCURRENCE**

---

MARTHA CRAIG DAUGHTREY, Circuit Judge. I concur in the majority's decision to affirm the judgment of the district court in this case. I write separately, however, to indicate that I do not join in that portion of section III.B(10)(a) that treats the question of the constitutionality of Ohio's method of execution, nor in section III.B(10)(b), involving the petitioner's challenges to Ohio's death penalty statute based on international law. Both questions were, as the majority opinion notes, procedurally defaulted and, in my judgment, do not warrant an advisory decision on their merits.

IV

For the foregoing reasons, the judgment of the district court is AFFIRMED and Buell's petition for a writ of habeas corpus is DENIED.

recommendation that a death sentence be imposed and on April 11, 1984, the trial court sentenced Buell to death. Buell subsequently appealed to the Ohio Court of Appeals and the Ohio Supreme Court. Both appeals were denied. On October 19, 1987, Buell filed a post-conviction petition in the Ohio trial court, which was denied. The petition was appealed to the Ohio Court of Appeals and the Ohio Supreme Court, both of which denied the petition.

On September 16, 1992, Buell filed a habeas petition in federal district court. The district court granted a stay of execution to allow the Ohio Court of Appeals to consider Buell's Application for Delayed Reconsideration relating to Buell's claim of ineffective assistance of appellate counsel. This claim was denied by the Court of Appeals and the Ohio Supreme Court.

On April 1, 1996, Buell filed a second habeas petition in federal district court, raising thirty-three grounds for relief. The petition was denied on July 22, 1999.

III

A

This court reviews the district court's judgment de novo. *See Rickman v. Bell*, 131 F.3d 1150, 1153 (6th Cir. 1997); *Lundy v. Campbell*, 888 F.2d 467, 469 (6th Cir. 1989). The district court's factual findings are reviewed for clear error. *See Rickman*, 131 F.3d at 1153; *McCall v. Dutton*, 863 F.2d 454, 459 (6th Cir. 1988). State court determinations of fact are entitled to a presumption of correctness unless the petitioner can demonstrate by convincing evidence that the facts are erroneous on one of the eight bases listed in 28 U.S.C. § 2254(d). *See McQueen v. Scroggy*, 99 F.3d 1302, 1310 (6th Cir. 1996).

The recent amendments to the habeas statutes enacted by the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) do not apply to this case because Buell filed his petition for a writ of habeas corpus before the effective date

of AEDPA. *See Lindh v. Murphy*, 521 U.S. 320, 326-27, 337 (1997). Therefore, Buell "is entitled to have the federal habeas court make its own independent determination of his federal claim, without being bound by the determination on the merits of that claim reached in the state proceedings." *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977). Buell may not, however, raise "contentions of federal law which are not resolved on the merits in the state proceedings due to petitioner's failure to raise them there as required by state procedure." *Ibid.*

## B

Buell raises ten claims on appeal: (1) the district judge reviewing Buell's second habeas petition erred in not recusing himself from the case; (2) the district court erred in ruling that certain of Buell's claims were procedurally defaulted; (3) Buell's constitutional right to due process was violated by the trial court's penalty-phase jury instructions; (4) Buell's constitutional rights were denied by the trial court's refusal to permit a psychologist's testimony relating to the credibility of certain witnesses' identification testimony; (5) Buell was deprived of the effective assistance of trial and appellate counsel; (6) Buell was deprived of his right to confront the witnesses against him by the prosecution's withholding of exculpatory evidence; (7) Buell was deprived of his right to be present at all critical stages of his trial; (8) Buell was denied his constitutional right to a fair trial as a result of prosecutorial misconduct; (9) Buell was denied his constitutional right to due process as a result of errors in the trial court's guilt-phase jury instructions; and (10) the Ohio death penalty statute is unconstitutional and violates international law. We will address each of these issues in turn.

### 1. Refusal of District Judge to Recuse Himself

Buell argues that the district court judge reviewing his habeas petition, Judge Paul R. Matia, erred in not recusing himself after Buell filed a motion to disqualify pursuant to 28 U.S.C. § 455(a). In his motion, Buell asserted that Judge

country's international obligations and how best to carry them out.[10]

Courts that have considered the question of whether international law bars capital punishment in the United States have uniformly concluded that it does not. *See, e.g., Jamison*, 100 F. Supp. 2d at 766 ("the Court finds no indication that the international obligations of the United States compel elimination of capital punishment"); *People v. Ghent*, 739 P.2d 1250, 1277 (Cal. 1987) (Mosk, J., concurring) ("I cannot agree with defendant that our international obligations, at least up to the present time, compel elimination of capital punishment.").[11] We must join in that conclusion.

---

[10] Our holding is limited to the question of whether customary international law prevents a State from carrying out the death penalty when it is acting in full compliance with the United States Constitution. We take no position on the question of the role of federal courts to apply customary international law as federal law in other contexts, a subject of recent lively academic debate. Compare Harold Hongju Koh, *Is International Law Really State Law?*, 111 HARV. L. REV. 1824, 1824 (1998) ("Customary international law is federal law, to be enunciated authoritatively by the federal courts.") with Curtis A. Bradley & Jack L. Goldsmith, *Customary International Law as Federal Common Law: A Critique of the Modern Position*, 110 HARV. L. REV. 815, 856 (1997) ("Is there domestic federal authorization for federal courts to interpret and apply [customary international law] as federal law in the wholesale fashion contemplated by the modern position? Nothing on the face of the Constitution or any federal statute authorizes such a practice.").

[11] We note that in the recent LaGrand Case (Germany v. U.S.), 2001 I.C.J. ___ (June 27), in which the International Court of Justice found the United States to have violated the Vienna Convention on Consular Protection by not informing two German citizens sentenced to the death penalty in Arizona of their right to contact German consular officials after their arrest and conviction, the court's holding was limited to the issue of consular protection and did not discuss whether the imposition of the death penalty violates international law.

death penalty at the time prohibited the execution of juveniles and that some of the other nations had ratified international treaties that prohibited the execution of juveniles. *Id*. at 389 (Brennan, J., dissenting).  The dissent concluded that, "[w]ithin the world community, the imposition of the death penalty for juvenile crimes appears to be overwhelmingly disapproved." *Id*. at 390.  Although the plurality opinion did not specifically address this argument, it rejected it in holding that the execution of juveniles was constitutional and in noting that "no modern societal consensus" forbids the imposition of death penalty individuals as young as sixteen. Subsequent courts have relied on *Stanford* in rejecting attacks on the juvenile death penalty as a violation of international agreements (particularly the International Covenant) and customary norms of international law. *See Ex parte Pressley*, 770 So. 2d 143, 148-49 (Ala.), *cert. denied*, 121 S. Ct. 313 (2000); *Domingues v. Nevada*, 961 P.2d 1279, 1280 (Nev. 1998), *cert. denied*, 528 U.S. 963 (1999).

Courts have made clear that "[i]nternational law does not require any particular reaction to violations of law . . . . Whether and how the United States wishes to react to such violations are domestic questions." *Estate of Ferdinand Marcos*, 25 F.3d 1467, 1475 (9th Cir. 1994) (quoting *Tel-Oren v. Libyan Arab Republic*, 726 F.2d 774, 779 (D.C. Cir. 1984) (Edwards, J., concurring)).  We believe that in the context of this case, where customary international law is being used as a defense against an otherwise constitutional action, the reaction to any violation of customary international law is a domestic question that must be answered by the executive and legislative branches.  We hold that the determination of whether customary international law prevents a State from carrying out the death penalty, when the State otherwise is acting in full compliance with the Constitution, is a question that is reserved to the executive and legislative branches of the United States government, as it their constitutional role to determine the extent of this

Matia had a duty to recuse himself because (1) as a member of the Ohio State Senate in 1981, he had sponsored the bill restoring Ohio's death penalty and (2) he had expressed support for the death penalty while campaigning for Lieutenant Governor of Ohio in 1982.  This claim has not been defaulted and has been properly preserved for appellate review.

This court reviews a district court's refusal to grant a motion for recusal for abuse of discretion.  *See Easley v. Univ. of Mich. Bd. of Regents*, 906 F.2d 1143, 1146 (6th Cir. 1990).  This court has stated that a district judge must recuse himself where "a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned." *United States v. Nelson*, 922 F.2d 311, 319 (6th Cir. 1990).  Buell provides no caselaw to support his proposition that Judge Matia should have disqualified himself for having sponsored the legislation restoring the death penalty to Ohio or for his statements while campaigning for Lieutenant Governor of Ohio.  There is no allegation claiming, nor evidence in the record indicating, that Judge Matia made any statements relating in any way to Buell or Buell's prosecution.  Indeed, the activities upon which Buell's motion is predicated all occurred prior to Buell's indictment and conviction.

It is well established that a judge's expressed intention to uphold the law, or to impose severe punishment within the limits of the law upon those found guilty of a particular offense, will not ordinarily satisfy the requirements of disqualification under Section 455(a). *See United States v. Gigax*, 605 F.2d 507, 514 (10th Cir. 1979); *United States v. Haldeman*, 559 F.2d 31, 134 n.302 (D.C. Cir. 1976) (citing *Knapp v. Kinsey*, 232 F.2d 458, 466 (6th Cir. 1956)).  Judge Matia's actions and statements regarding the death penalty are not enough to demonstrate that he should have recused himself.

More generally, this court has indicated that a judge is not automatically disqualified from a case on the basis of having

sponsored or voted upon a law in the state legislature that he is later called upon to review as a judge. *See Leaman v. Ohio Dept. of Mental Retardation*, 825 F.2d 946, 949-50 & n.1 (6th Cir. 1987).[1] This court has stated that sponsorship of a law is similar to the expression of an opinion on a legal issue, which does not create the appearance of impropriety. *See id.* at 949 n.1. Furthermore, in ruling on an ineffective assistance of counsel claim predicated on the assertion that a capital defendant's lawyer should have told him that his state court sentencing judge had previously voted for a statute permitting the death penalty while a South Carolina state senator, the Fourth Circuit stated that, "[o]ne who has voted as a legislator in favor of a statute permitting the death penalty in a proper case cannot thereafter be presumed disqualified to hear capital cases as a judge or predisposed to give a death sentence in any particular case." *Shaw v. Martin*, 733 F.2d 304, 316 (4th Cir. 1984).

Other courts have explicitly held that judges are not disqualified from hearing cases involving legislation they had voted upon or drafted before serving on the bench. *See Newburyport Redevelopment Auth. v. Commonwealth*, 401 N.E.2d 118, 144 (Mass. App. Ct. 1980) (rejecting contention that judge should have recused himself since he was a member of Massachusetts legislature when bill that was subject of litigation was enacted); *Williams v. Mayor & Council of the City of Athens*, 177 S.E.2d 581, 581 (Ga. Ct.

---

[1] Buell argues that *Leaman* involved special circumstances that limit the ruling to that case. He notes that the case involved a Sixth Circuit judge who had recused himself *after* having voting for rehearing en banc and after having participated in reargument. In its en banc opinion, this court discussed the effect of the judge's recusal. In the process, the court stated "the mere fact of recusal does not mean that the recusing judge had concluded that his recusal was mandatory." 825 F.2d at 949. In dicta, the court stated that a judge is not required to recuse himself where, as a legislator, he had been involved in legislation that he was now reviewing as a judge. Although this dicta was issued without the benefit of briefing or argument by the parties, *id.* at 966 (Merritt, J., dissenting), it was issued on the basis of interpretation of judicial precedents. Buell provides no credible legal arguments for not applying the principle in this case.

interpose customary international law as a defense against "acts committed by . . . government officials against a citizen of the United States." *Hawkins*, 33 F. Supp. 2d at 1255. If anything, the standards for implying a civil private right of action under international law should be less than those for using international law as a defense against otherwise lawful government action under the Constitution. *See* Christenson, *supra*, at 491 (1997) (stating that "[e]specially inventive, but going nowhere, [is] the recent claim[] that . . . peremptory norms place limits upon certain constitutional powers granted under the Constitution" and noting that the claim is "misguided in international law").

We note that courts have rejected the application of international law in the context of the execution of juvenile offenders, where a seemingly stronger argument might exist for the use of international law to prevent such actions. *See* Connie de la Vega & Jennifer Fiore, *The Supreme Court of the United States has been Called upon to Determine the Legality of the Juvenile Death Penalty in* Michael Domingues v. State of Nevada, 21 WHITTIER L. REV. 215, 225-29 (1999); Ved P. Nanda, *The United States Reservation to the Ban on the Death Penalty for Juvenile Offenders: An Appraisal Under the International Covenant on Civil and Political Rights*, 42 DEPAUL L. REV. 1311, 1336 (1993); David Weissbrodt, *Execution of Juvenile Offenders by the United States Violates International Human Rights Law*, 3 AM. U. J. INT'L L. & POL'Y 339, 367-69 (1988); Joan F. Hartman, *"Unusual" Punishment: The Domestic Effects of International Norms Restricting the Application of the Death Penalty*, 52 U. CIN. L. REV. 655, 691-95, 699 (1983).

In *Stanford v. Kentucky*, 492 U.S. 361 (1989), the Supreme Court stated that, [w]e discern neither a historical nor a modern societal consensus forbidding the imposition of capital punishment on any person who murders at 16 or 17 years of age." *Id.* at 380. As a result, the Court held that "such punishment does not offend the Eighth Amendment's prohibition against cruel and unusual punishment." *Ibid.* The dissent noted that over half of the nations that retained the

*rev'd on other grounds*, 251 F.3d 1230 (9th Cir. 2001) ("[T]his Court is also hesitant to interfere in an area that is traditionally entrusted to the legislative and executive branches. It is these two branches which must interpret what international obligations the United States will undertake and how to implement them domestically.").

Courts that have determined that private rights of actions exist under customary norms of international law have done so where acts were committed on a foreign citizen or acts were committed by a foreign government or government official. *See Hawkins*, 33 F. Supp. 2d at 1255 (citing cases). "There is no reported case of a court in the United States recognizing a cause of action under *jus cogens* norms of international law for acts committed by United States government officials against a citizen of the United States." *Ibid*; *see also* Gordon A. Christenson, *Federal Courts and World Civil Society*, 6 J. TRANSNAT'L L & POL'Y 405, 485 (1997) ("No U.S. court has invoked the international prohibition against official torture as a peremptory or *jus cogens* norm to justify a cause of action by itself, except by possible dictum. In fact, courts in the United States have uniformly rejected application of an asserted *jus cogens* norm as the sole basis for a cause of action."). Christenson further notes that "[w]hile some language in several decisions of courts of appeal states that U.S. courts have recognized the concept of *jus cogens* as part of U.S. law, not a single case has been decided on that basis alone without having been overturned." *Ibid*. (citing *Princz v. F.R.G.*, 26 F.3d 1166 (D.C. Cir. 1994) (reversing district court's reliance on *jus cogens* in claim of American citizen and Holocaust survivor who sued the Federal Republic of Germany for damages based on having been a prisoner in Nazi concentration camps)).

We believe that the same logic applies in this case, though Buell, a United States citizen, is not asserting a private right of action, but instead is using international law as a defense against actions taken by Ohio's government that comply fully with the United States Constitution. He is attempting to

App. 1970) (trial judge not required to recuse himself where, while previously serving as city attorney, he drafted ordinance banning possession and operation of a pinball machine in city limits and defendant appearing before him was charged with violation of that ordinance); *In the Matter of Thomas W. Sullivan*, 219 So. 2d 346, 353 (Ala. 1969) ("A judge is not disqualified to try a case because he had been a member of the legislature enacting a statute involved in litigation before him."). These cases were noted in *Leaman* to support the proposition that it is permissible for a judge to hear cases involving laws passed while the judge served as a legislator. The *Leaman* court noted that this was the practice of the late United States Supreme Court Chief Justice Fred Vinson and the late Supreme Court Justices Harold Burton and Hugo Black, who "routinely sat on cases involving legislation passed while they were members of Congress." 825 F.2d at 949.

The *Leaman* court also indicated that only one published case, *Limeco, Inc. v. Division of Lime*, 571 F. Supp. 710 (N.D. Miss. 1983), has taken a contrary position. In *Limeco*, a senior district judge recused himself from a case involving the State of Mississippi's Division of Lime on the basis that forty-one years prior, while a member of the state legislature, he voted against legislation allowing the state to establish state-run lime-crushing facilities. The judge admitted he had forgotten his vote, stating "the passage of [time] is of such magnitude as to obliterate any recall of a single act which apparently occurred in the pell mell rush of the beginning of a session of the Mississippi Legislature." *Id.* at 711. Yet, the judge still recused himself, stating that his vote in the legislature might create a situation in which his impartiality might reasonably be questioned. *Ibid.*

We decline to hold that *Limeco* correctly states a rule of mandatory recusal and believe the weight of authority to the contrary to be far more persuasive. We hold that a judge who, as a legislator, sponsored or voted for legislation implementing or favoring the death penalty cannot be presumed to be disqualified from reviewing capital cases as

a judge. Establishing a rule that a judge must recuse himself in cases involving legislation that had been enacted when a judge served as a legislator would force recusal in an inordinate amount of cases. In addition, it might prevent individuals who are or were legislators from serving as members of the judiciary and from bringing their unique perspectives to the bench. *See United States v. Alabama*, 828 F.2d 1532, 1543 (11th Cir. 1987) ("It appears to be an inescapable part of our system of government that judges are drawn primarily from lawyers who have participated in public and political affairs."); *Home Placement Serv., Inc. v. Providence Journal Co.*, 739 F.2d 671, 675 (1st Cir. 1984) ("It is common knowledge, or at least public knowledge, that the first step to the federal bench for most judges is either a history of active partisan politics or strong political connections.").

Moreover, such a rule does not comport with 28 U.S.C. § 455(a), which states that a judge "shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." This rule requires a fact-specific analysis of the judge's prior activity, legislative or otherwise, to determine if disqualification is required. In this case, Judge Matia's sponsorship of legislation reinstating the death penalty in Ohio and opinions in favor of the death penalty while campaigning for public office are not sufficient to demonstrate that his "impartiality might reasonably be questioned" in a particular case, any more than support for civil rights laws as a legislator would disqualify a judge from hearing all discrimination cases.

We realize that in some cases a judge's legislative activities may be intimately connected with the facts of a particular case and may therefore require recusal. *See, e.g., United States v. Alabama*, 828 F.2d at 1543-44 (holding that district judge must be disqualified not because of his "views expressed . . . as a political figure and member of the Alabama State Senate" but because "[d]uring his tenure in the state legislature, the trial judge actively participated in the very events and shaped the very facts that are at issue in this suit."). However, there

*of the Principal International Human Rights Treaties* (June 14, 2001), *at* http://www.unhchr.ch/pdf/report.pdf.

There is no indication that the countries that have abolished the death penalty have done so out of a sense of legal obligation, rather than for moral, political, or other reasons. Moreover, since the abolition of the death penalty is not a customary norm of international law, it cannot have risen to the level that the international community as a whole recognizes it as *jus cogens*, or a norm from which no derogation is permitted. Therefore, we cannot conclude that the abolition of the death penalty is a customary norm of international law or that it has risen to the higher status of *jus cogens*.

Even if we were to conclude that the abolition of the death penalty was a customary norm of international law or rose to the higher level of being a peremptory norm or *jus cogens*, we do not believe that this would be a sufficient basis for our court to invalidate Ohio's death penalty statute.

In *White v. Paulsen*, 997 F. Supp. 1380, 1383-85 (E.D. Wash. 1998), the district court, analogizing to *Bivens v. Six Unknown Named Agents of the Fed. Bureau of Narcotics*, 403 U.S. 388, 392 (1971), stated that "federal courts have the authority to imply the existence of a private right of action for violations of *jus cogens* norms of international law." *Id.* at 1383. While the court recognized this authority, it went on to state, "[w]hether a federal court *should* imply the existence of such a remedy in the context of a particular case is a different question." *Id*. at 1384. In declining to imply the existence of a private right of action, the court expressly noted that it was "being asked to address a matter that is principally entrusted by the federal constitution to Congress or the Executive." *Id*. at 1385. The court stated that "[t]he determination of what international obligations the United States chooses to recognize or enforce is an area that has been recognized as entrusted principally to the Legislative and Executive branches of the federal government." *Ibid*.; *see also Hawkins v. Comparet-Cassani*, 33 F. Supp. 2d 1244 (C.D. Cal. 1999),

reached.' Meijers, *How Is International Law Made?*, 9 NETHERLANDS Y.B. INT'L L. 3, 5 (1978). As to what constitutes the necessary number of 'relevant states,' the [International Court of Justice] has said that 'State practice . . . should have been both extensive and virtually uniform in the sense of the provision invoked.' *The North Sea Continental Shelf Case (Judgment)*, 1969 I.C.J. 12, 43. Finally, in order for such a customary norm of international law to become a peremptory norm, there must be a further recognition by 'the international community . . . *as a whole* [that this is] a norm from which no derogation is permitted.' Vienna Convention [on the Law of Treaties,] art. 53 (emphasis added).

859 F.2d at 940.

The prohibition of the death penalty is not so extensive and virtually uniform among the nations of the world that it is a customary international norm. This is confirmed by the fact that large numbers of countries in the world retain the death penalty. *See Wills v. Texas*, 511 U.S. 1097, 1100 n.2 (1994) (Blackmun, J., dissenting) (recognizing that over seventy nations retained the death penalty as of then); Short, *supra* page 49, at 744-45 (indicating that as of December 1995, ninety countries retained full use of the death penalty, while as of the end of 1997, only sixty-one countries, or approximately thirty-two percent of countries, had completely abolished use of the death penalty); William A. Schabas, *International Law and the Abolition of the Death Penalty*, 55 WASH. & LEE L. REV. 797, 799, 845 (1998) (citing 1998 United Nations report that 102 states have abolished the death penalty while ninety retain it and 1997 Amnesty International figures that ninety-nine states have abolished the death penalty in law or in practice, while ninety-four nations retain it). Indeed, it is impossible to conclude that the international community as a whole recognizes the prohibition of the death penalty, when as of 2001, 147 states were parties to the International Covenant, which specifically recognizes the existence of the death penalty. Office of the United Nations High Commissioner for Human Rights, *Status of Ratification*

is no allegation in this case that Judge Matia's legislative or political activities were specifically connected to Buell's prosecution. Indeed, the activities occurred before Buell's prosecution. Moreover, Judge Matia's review of the legislation he sponsored was limited to Buell's contention that Ohio's death penalty statute is unconstitutional--one of thirty-three grounds for relief Buell presented to the district court.

Buell does not provide legal support for the proposition that Judge Matia was required to recuse himself. Much of Buell's argument is based on what judges should do. This court's analysis, however, is based on what judges must do. Judge Matia was not required to recuse himself and did not abuse his discretion in choosing not to do so.

### 2. Procedural Default

Buell contends that the district court erred in determining that certain of Buell's claims were procedurally defaulted.[2]

The parties agree and we concur that Buell's first and fourth claims have been fully preserved. The State argues that all or portions of the remaining seven claims have been procedurally defaulted. Specifically, the State asserts that all or portions of Buell's third claim (portion relating to penalty-phase jury instructions and non-unanimous sentencing verdict), sixth claim (portion relating to Roy Wilson's mental state), seventh claim (right to be present at portions of trial), eighth claim (prosecutorial misconduct), ninth claim (guilt-phase jury instructions), and tenth claim (international law and electrocution portions of death penalty challenge) were not presented on direct appeal. In addition, the State argues that portions of Buell's fifth claim relating to ineffective

---

[2] Before considering this claim, we note that we review the procedural status of each of Buell's claims at the beginning of our discussion of each claim during the course of this opinion.

assistance of appellate counsel were defaulted pursuant to Ohio R. App. P. 26.[3]

The Supreme Court has stated that "[i]n all cases in which a state prisoner has defaulted his federal claims in state court pursuant to an independent and adequate state procedural rule, federal habeas corpus review of the claims is barred unless the prisoner can demonstrate cause for the default and actual prejudice as a result of the alleged violation of federal law; or demonstrate that failure to consider the claims will result in a fundamental miscarriage of justice." *Coleman v. Thompson*, 501 U.S. 722, 749 (1991); *see also Simpson v. Jones*, 238 F.3d 399, 406 (6th Cir. 2000). This court applies a four-part test to determine if a claim is procedurally defaulted: (1) the court must determine that there is a state procedural rule that is applicable to the petitioner's claim and that the petitioner failed to comply with the rule; (2) the court must determine whether the state courts actually enforced the state procedural sanction; (3) it must be decided whether the state procedural forfeiture is an adequate and independent state ground upon which the state can rely to foreclose review of a federal constitutional claim; and (4) if the court has determined that a state procedural rule was not complied with and that the rule was an adequate and independent state ground, then the petitioner is required to demonstrate that there was cause for him not to follow the procedural rule and that he was actually prejudiced by the alleged constitutional error. *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986).[4]

---

[3]Buell chose not to pursue an ineffective assistance of trial counsel claim on direct review. Buell included an ineffective assistance of trial counsel claim in his post-conviction petition. Since Buell was represented by the same counsel at trial and on direct appeal, it was proper for him to raise his ineffective assistance of trial counsel claims for the first time in his post-conviction petition. *See State v. Cole*, 443 N.E.2d 169, 171 (Ohio 1982). Therefore, Buell's ineffective assistance of trial counsel claims were not defaulted and are preserved for habeas review.

[4]We note that this court indicated in *Scott v. Mitchell*, "[a]lthough we have remained faithful to the analysis endorsed by *Maupin*, our more recent decisions have not always employed a '*Maupin* test' per se." 209

relies do not specifically outlaw the death penalty. To the extent that the agreements ban cruel and unusual punishment, the United States has included express reservations preserving the right to impose the death penalty within the limits of the United States Constitution. Moreover, neither agreement is binding on courts of the United States.

### ii. Customary International Law

According to the Restatement, "[c]ustomary international law results from a general and consistent practice of states followed by them from a sense of legal obligations." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 102(2). Customary international law, then, consists of two components. First, there must be a "general and consistent practice of states." This does not mean that the practice must be "universally followed;" rather "it should reflect wide acceptance among the states particularly involved in the relevant activity." *Id.* at § 102, cmt. b. Second, there must be "a sense of legal obligation," or *opinio juris sive necessitatis*. In other words, "a practice that is generally followed but which states feel legally free to disregard does not contribute to customary law;" rather, there must be a sense of legal obligation. *Id.* at § 102, cmt. c. States must follow the practice because they believe it is required by international law, not merely because that they think it is a good idea, or politically useful, or otherwise desirable. Some customary norms of international law reach a "higher status," in which they "are recognized by the international community of states as peremptory [norms], permitting no derogation." *Id.* at § 102, cmt. k & cmt. n.6. These peremptory norms are also referred to as *jus cogens*.

The court's discussion in *Citizens Living in Nicaragua* of when a rule becomes a customary and, later, peremptory norm, or *jus cogens*, is instructive:

[C]ustomary international law is continually evolving. At a crucial stage of that process, '[w]ithin the relevant states, the will has to be formed that the rule will become law if the relevant number of states who share this will is

Crime of Genocide. This penalty can only be carried out pursuant to a final judgement rendered by a competent court.

ICCPR, 999 U.N.T.S. 171, 174. Furthermore, when the United States ratified the treaty in 1992, it specifically reserved the right:

subject to its Constitutional constraints, to impose capital punishment on any person (other than a pregnant woman) duly convicted under existing or future laws permitting the imposition of capital punishment, including such punishment for crimes committed by persons below eighteen years of age.

*See* 138 CONG. REC. S-4781-01, S4783 (1992); *see also* Short, *supra* page 49, at 726 & n.33.

Finally, we note that even if the agreements were to ban the imposition of the death penalty, neither is binding on federal courts. "Courts in the United States are bound to give effect to international law and to international agreements, except that a 'non-self-executing' agreement will not be given effect as law in the absence of necessary authority." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 111 (1987). Neither the American Declaration nor the International Covenant is self-executing, nor has Congress enacted implementing legislation for either agreement. *See Garza v. Lappin*, 253 F.3d 918, 923 (7th Cir. 2001) (stating that the "American Declaration . . . is an aspirational document which . . . did not on its own create any enforceable obligations on the part of any of the OAS member nations"); *Beazley v. Johnson*, 242 F.3d 248, 267-68 (5th Cir. 2001) (citing cases and other sources indicating that the International Covenant is not self-executing); *Hawkins*, 33 F. Supp. 2d at 1257 (noting that Congress has not enacted implementing legislation for the International Covenant).

We must conclude that Ohio's imposition of the death penalty does not violate any international agreements entered into by the United States. The agreements upon which Buell

The State presents convincing arguments as to Buell's procedural defaults, which Buell cannot overcome. Ohio courts have set forth a default rule barring consideration of claims that should have been raised on direct appeal. *See Cole*, 443 N.E.2d at 171; *State v. Perry*, 226 N.E.2d 104, 108 (Ohio 1967). Ohio courts have consistently held that claims that can be adjudicated based on facts in the record can only be presented on direct appeal. *See, e.g., State v. Lentz*, 639 N.E.2d 784, 785 (Ohio 1994). This court has held that this rule is regularly and consistently applied by Ohio courts as required by the four-part *Maupin* test. *See Byrd*, 209 F.3d at 521-22.

Buell contends that the Ohio state courts did not invoke any applicable procedural rule. Yet the Ohio courts could not invoke a procedural rule against claims that were not brought before it. Buell asserted four claims on direct appeal and in his post-conviction petition, while his habeas petition contained thirty-three claims and hundreds of subclaims. This court has previously stated that a petitioner's failure to raise his claims in Ohio courts is an adequate and independent state law ground for upholding the petitioner's conviction and sentence. *See Mapes v. Coyle*, 171 F.3d 408, 413 (6th Cir. 1999). Recently, we stated that a petitioner "cannot obtain federal *habeas* relief under 28 U.S.C. § 2254 unless he has completely exhausted his available state court remedies to the state's highest court." *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001). Furthermore, we noted that "a petitioner cannot circumvent the exhaustion requirement by failing to comply with state procedural rules." *Ibid.* This is precisely what Buell has done. We conclude that portions of Buell's third, sixth, and tenth claims and his entire seventh, eighth, and ninth claims were procedurally defaulted because they were not presented to the Ohio courts on direct appeal.

---

F.3d 854, 863 n.4 (6th Cir. 2000) (citing *Byrd v. Collins*, 209 F.3d 486, 520-21 (6th Cir. 2000) and *Jones v. Toombs,* 125 F.3d 945, 946 (6th Cir. 1997)). *See also Simpson v. Jones*, 238 F.3d at 406.

Buell attempts to use the ineffective assistance of appellate counsel claims that he brought to the Ohio courts as cause to excuse his procedurally defaulted claims. In *Edwards v. Carpenter*, the Supreme Court held that "an ineffective-assistance-of-counsel claim asserted as cause for the procedural default of another claim can itself be procedurally defaulted." 529 U.S. 446, 453 (2000). The Court pointed out that it may be possible for a procedurally defaulted ineffective assistance of appellate counsel claim to "be excused if the prisoner can satisfy the cause-and-prejudice standard with respect to *that* claim." *Ibid.*

The State asserts that Buell defaulted his ineffective assistance of appellate counsel claims by failure to comply with Ohio R. App. P. 26. In February 1992, while Buell's initial habeas petition was pending in federal district court, the Ohio Supreme Court decided *State v. Murnahan*, 584 N.E.2d 1204 (Ohio 1992). *Murnahan* held that claims of ineffective assistance of appellate counsel should be raised in a motion for reconsideration before the Ohio Court of Appeals and not in a petition for post-conviction relief. *Id.* at 1208. The court stated that if "the time periods for reconsideration in courts of appeals and direct appeal to [the Ohio Supreme Court] have expired, [a defendant] must . . . apply for delayed reconsideration in the court of appeals where the alleged error took place pursuant to App. R. 26 and 14(B)." *Id.* at 1209. On September 17, 1992, Buell filed a motion for delayed reconsideration of his direct appeal, raising seventy-one reasons why he had been denied the effective assistance of counsel in his 1985 direct appeal. At the time *Murnahan* was decided and Buell filed his motion for delayed reconsideration, Ohio R. App. P. 26 stated that a party must file its motion for reconsideration "before the judgment or order of the court has been approved by the court and filed by the court with the clerk for journalization or within ten days after the announcement of the court's decision, whichever is the later." This period had long passed since the judgment in Buell's direct appeal was filed on April 1, 1985. However, at the time Buell filed his motion for delayed reconsideration, Ohio R. App. P. 14(B) provided that

States Senate approved the OAS Charter with the reservation that "none of its provisions shall be considered as . . . limiting the powers of the several states . . . with respect to any matters recognized under the Constitution as being within the reserved powers of the several states." Charter of the Organization of American States, 1951, 2 U.S.T. 2394, 2484.

The International Covenant was ratified by the United States Senate on June 8, 1992. Contrary to the positions of Buell and perhaps of the United Nations Commission on Human Rights, the International Covenant does not require its member countries to abolish the death penalty. Article 7 of the International Covenant prohibits cruel, inhumane, or degrading punishment. International Covenant on Civil and Political Rights (ICCPR), opened for signature Dec. 19, 1966, art. 7, 999 U.N.T.S. 171, 175 (entered into force Mar. 23, 1976). The United States agreed to abide by this prohibition only to the extent that the Fifth, Eighth, and Fourteenth Amendments ban cruel and unusual punishment. *See* 138 Cong. Rec. S-4781-01, S4783 (1992) ("That the United States considers itself bound by article 7 to the extent that 'cruel, inhuman or degrading treatment or punishment' means the cruel and unusual treatment or punishment prohibited by the Fifth, Eighth, and/or Fourteenth Amendments to the Constitution of the United States."); *see also Jamison v. Collins*, 100 F. Supp. 2d 647, 766 (S. D. Ohio 2000) (citing Christy A. Short, Comment, *The Abolition of the Death Penalty*, 6 Ind. J. Global Legal Stud. 721, 725-26, 730 (1999)).

Moreover, the International Covenant specifically recognizes the existence of the death penalty. Article 6, paragraph 2, of the treaty states:

> In countries which have not abolished the death penalty, sentence of death may be imposed only for the most serious crimes in accordance with the law in force at the time of the commission of the crime and not contrary to the provisions of the present Covenant and to the Convention on the Prevention and Punishment of the

questions of right depending upon it are duly presented for their determination." *The Paquete Habana*, 175 U.S. 677, 700 (1900). In order to define what is a "rule of international law," the Restatement (Third) of Foreign Relations Law instructs us:

(1) A rule of international law is one that has been accepted as such by the international community of states

(a) in the form of customary law;

(b) by international agreement; or

(c) by derivation from general principles common to the major legal systems of the world.

RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 102(1) (1987). Buell argues that the abolition of the death penalty has been accepted by international agreement and as a form of customary law. We will address each of these arguments in turn.

### i. International Agreement

It is recognized that "[a]n international agreement creates obligations binding between the parties under international law." RESTATEMENT (THIRD) OF FOREIGN RELATIONS LAW § 102, cmt. f. The binding nature of international agreements is also referred to as *jus dispositivum*. Buell contends that the Ohio death penalty violates international agreements entered into by the United States, specifically the American Declaration as made binding by the OAS Charter and the International Covenant. These agreements do not prohibit the death penalty, however. Moreover, the United States has approved each agreement with reservations that preserve the power of each of the several states and of the United States, under the Constitution.

Neither the OAS Charter nor the American Declaration specifically prohibit capital punishment. *See State v. Phillips*, 656 N.E.2d 643, 671 (Ohio 1995). Furthermore, the United

"The court for good cause shown may upon motion enlarge or reduce the time prescribed by these rules."

The Ohio Court of Appeals denied Buell's motion on September 21, 1992, stating solely: "Motion by appellant for delayed reconsideration denied per *State v. Murnahan* (1992), 63 Ohio St.3d 60." The Ohio Supreme Court affirmed on November 17, 1993, stating in pertinent part: "This cause, here on appeal from the Court of Appeals for Cuyahoga County, was considered in the manner prescribed by law. On consideration thereof, the judgment of the court of appeals is affirmed."

Given the procedural facts of this case we are reluctant to conclude that Buell's motion for delayed reconsideration was based on an adequate and independent state ground and that, therefore, his ineffective assistance of appellate counsel claims were procedurally defaulted. Both the Ohio Court of Appeals and Ohio Supreme Court decisions denying Buell's motion for delayed reconsideration offered little explanation for why Buell's delayed motion was denied.[5] We recognize that the requirement that a state court "clearly and expressly" state that its judgment was based on a state procedural rule applies only when a state court judgment rests primarily on federal law or is interwoven with federal law. *See Simpson v. Jones*, 238 F.3d at 407, 408; *Simpson v. Sparkman*, 94 F.3d 199, 202 (6th Cir. 1996). Therefore, "[w]hen it does not fairly appear that the state court rested its decision on federal grounds or its decision was interwoven with federal law, the presumption that the decision does not rest on independent and adequate state grounds does not apply." *Simpson v. Sparkman*, 94 F.3d at 202 (citing *Coleman v. Thompson*, 501

---

[5] We also note that in *Murnahan*, the Ohio Supreme Court instructed state courts of appeal that "[i]f the court summarily dismisses the request for reconsideration, it shall state in its entry the reasons for not further reviewing the defendant's request." 584 N.E.2d at 1209. To the extent that the Ohio Court of Appeals does not appear to have complied with this requirement, this would be an error of state law that is not cognizable on habeas review. *See Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991).

U.S. at 739). While the brief opinions of the Ohio courts may have been sufficient to erect a procedural bar in this case, we must conclude that the rule that was applied to bar Buell's claims was not "firmly established and regularly followed" at the time of the relevant decisions in this case. *See Johnson v. Mississippi*, 486 U.S. 578, 587 (1988); *accord Rogers v. Howes*, 144 F.3d 990, 993-94 (6th Cir. 1998).

In *Coleman v. Mitchell*, this court recently concluded that the denial of a prisoner's motion for delayed reconsideration by the Ohio courts constituted a procedural default. 244 F.3d at 540. The circumstances in *Coleman* differed from this case in several critical respects. The differences illustrate the reasons why, given the unique facts of this case, the procedural bar was not firmly established and regularly followed. First, in *Coleman*, our court specifically noted that Coleman waited sixteen months after *Murnahan* was decided before filing his motion for reconsideration. 244 F.3d at 540. Buell, on the other hand, waited seven months. Second, the *Coleman* court concluded that the rule adopted by the Ohio Supreme Court in *Murnahan* was well established in Ohio's First Appellate District--where Coleman filed his motion for delayed reconsideration--long before *Murnahan* was decided and before Coleman's case ever arose. *Coleman v. Mitchell*, 244 F.3d at 540 (citing *State v. Rone*, Nos. C-820322, B-784088, 1983 WL 8877 (Ohio Ct. App. June 1, 1983)). In Buell's case, the *Murnahan* rule had been well established in Ohio's Eighth Appellate District, where Buell filed his motion for delayed reconsideration, at least as early as 1988. *See State v. Anderson,* No. 55504, 1989 WL 65673 (Ohio Ct. App. June 15, 1989); *State v. Mitchell*, 559 N.E.2d. 1370, 1371-72 (Ohio Ct. App. 1988); *see also State v. Morales*, Nos. 57868, 57869, 1991 WL 8592, at * 4 (Ohio Ct. App. Jan 31. 1991) (McManamon, J., concurring) ("This court consistently has held that [ineffective assistance of appellate counsel] claims are not cognizable under the post-conviction relief statute." (citing *Anderson* and *Mitchell*)). However, in *Morales*, the Eighth Appellate District recognized that in some cases a defendant could raise a claim for ineffective assistance of appellate counsel in a petition for post-

### b.   *International Law Challenges to Ohio's Death Penalty Statute*

Buell argues that Ohio's death penalty statute violates the Supremacy Clause of the United States Constitution by not complying with: (1) the American Declaration of the Rights and Duties of Men ("American Declaration") as made binding on the United States by the Charter of the Organization of American States ("OAS Charter"), and (2) the International Covenant on Civil and Political Rights ("International Covenant"). In addition, Buell notes statistics indicating that over one hundred nations prohibit executions, a number that he claims is far greater than necessary to establish a customary international law norm. *Cf. Filartiga v. Pena-Irala*, 630 F.2d 876, 884 (2d Cir. 1980) (noting survey that fifty-five nations ban torture in the process of concluding that official torture is prohibited by the law of nations). Buell relies on the urging of the United Nations Commission on Human Rights that countries abide by the International Covenant and eliminate the death penalty. *See* United Nations, High Commissioner for Human Rights, *Question of the Death Penalty*, Commission on Human Rights Resolution 1998/8, at Nos. 3-4 (promoting restrictions on the use of the death penalty, including the imposition of a moratorium on all executions, "with a view to completely abolishing the death penalty"). Buell contends that the prohibition of executions is not only a customary norm of international law, but rather, a peremptory norm of international law, or *jus cogens*, that is accepted and recognized by the international community and that cannot be derogated. *See* Vienna Convention on the Law of Treaties, May 23, 1969, art. 53, 1155 U.N.T.S. 331; *see also In re Estate of Ferdinand Marcos, Human Rights Litigation*, 25 F.3d 1467, 1472 (9th Cir. 1994); *Committee of United States Citizens Living in Nicaragua v. Reagan*, 859 F.2d 929, 935, 940 (D.C. Cir. 1988).

Buell's argument is wholly meritless. It is a long-standing principle under United States law that "[i]nternational law is part of our law, and must be ascertained and administered by the courts of justice of appropriate jurisdiction as often as

When it reviewed Buell's challenge to the Ohio death penalty statute, the Ohio Supreme Court reaffirmed its prior holdings that Ohio law requires the additional elements of prolonged restraint, secretive confinement, or significant movement separate from that involved in the underlying crime in order to warrant application of the aggravated circumstance of kidnapping under OHIO REV. CODE § 2929.04(A)(7). *State v. Buell*, 489 N.E.2d at 811; *see also State v. Maurer*, 473 N.E.2d 768, 775 (Ohio 1984). The Ohio Supreme Court noted that the significant movement and restraint of Krista Harrison were not intrinsic to her murder. *State v. Buell*, 489 N.E.2d at 811. As a result, the aggravating circumstances that the jury found at the penalty phase of trial distinguished Buell's case from others in which death sentences were not imposed. Therefore, a narrowing principle was applied to justify the imposition of the death penalty.

Finally, Buell asserts that death by electrocution, as required under OHIO REV. CODE § 2949.22, violates the constitutional prohibition of cruel and unusual punishment. Courts have consistently upheld the constitutionality of the imposition of the death penalty in general, *see Gregg*, 428 U.S. at 187, and by electrocution in particular. *See In re Kemmler*, 136 U.S. 436, 449 (1890); *Sullivan v. Dugger*, 721 F.2d 719, 720 (11th Cir. 1983); *Spinkellink v. Wainwright*, 578 F.2d 582, 616 (5th Cir. 1978). This court recently concluded that a petitioner attacking the constitutionality of death by electrocution failed even to present an indication of a likelihood of success on the merits. *See In re Sapp*, 118 F.3d 460, 464 (6th Cir. 1997). Moreover, we note that the Ohio statute allows Buell the option of choosing between death by electrocution or death by lethal injection, a form of execution that Buell does not argue is cruel and unusual. OHIO REV. CODE § 2949.22(B); *see also Smith v. Anderson*, 104 F. Supp. 2d 773, 848 (S.D. Ohio 2000). Electrocution has yet to be found cruel and unusual punishment by any American court. *See Sapp*, 118 F.3d at 464. We decline to be the first.

conviction relief. 1991 WL 8592, at * 3. Therefore, when Buell filed his motion for delayed reconsideration in September 1992, it was not firmly established in the Eighth Appellate District that a defendant must file his ineffective assistance of appellate counsel claims in a motion for reconsideration, given the conflicting opinions in *Mitchell* in 1988, in *Morales* in 1991, and in *Murnahan* in 1992. Third, the fact that the rule was firmly established and regularly followed in the First Appellate District was reinforced when, in dismissing Coleman's motion for delayed reconsideration, the Ohio Court of Appeals specifically noted that it was filed ninety days after Coleman's appellate judgment and that Coleman had not shown good cause for the delay, as required by Ohio R. App. P. 26(B).[6] In Buell's case, however, the Eighth Appellate District simply stated that Buell's motion for delayed reconsideration was "denied per *State v. Murnahan* (1992), 63 Ohio St.3d 60." Given the confusion regarding the proper mechanism for raising motions for delayed reconsideration that existed in the Eighth Appellate District prior to *Murnahan*, this explanation, unlike that given by the First Appellate District to Coleman, is not sufficient to demonstrate that the *Murnahan* rule was firmly established and regularly followed in Ohio's Eighth Appellate District at the time it reviewed Buell's motion for delayed reconsideration in September 1992. As a result, we are unable to conclude that the *Murnahan* rule was an adequate and independent state ground to foreclose review of Buell's ineffective assistance of appellate counsel claims.

Although Buell's claims for ineffective assistance of appellate counsel were not defaulted, Buell's task is not done. Buell's ineffective assistance of appellate counsel claims can serve as cause for the procedural default of his other claims

---

[6] In *Coleman*, 244 F.3d at 539-40, the Ohio Court of Appeals applied Ohio R. App. P. 26(B), which was enacted July 1, 1993, at the request of the *Murnahan* court, 584 N.E.2d 1204, 1209 n.6. The Ohio Court of Appeals denied Buell's request for consideration on September 21, 1992, a little over nine months before the amendments to Ohio R. App. P. 26(B) were enacted.

only if Buell can demonstrate that his appellate counsel was constitutionally ineffective. *See Edwards*, 529 U.S. at 451. To do so, a defendant must show that his counsel's performance was deficient and that the deficient performance prejudiced the defense. *See Strickland v. Washington*, 466 U.S. 668, 687 (1984). Buell's appellate counsel was not deficient for failing to raise on direct appeal nonfrivoulous claims after deciding as a matter of professional judgment not to raise those points. *Coleman v. Mitchell*, 244 F.3d at 541. Even if Buell's counsel was deficient for not having raised the defaulted claims on appeal, we have reviewed the substance of each of these claims and have determined that each of them lacks merit. Therefore, Buell is unable to demonstrate that, even if his appellate counsel was deficient, his counsel's deficient performance prejudiced his defense. Since Buell cannot prevail on his ineffective assistance of appellate counsel claims, these claims cannot serve as cause for purposes of curing his other procedurally defaulted claims.

### 3. Penalty-Phase Jury Instructions

Buell challenges the district court's determination that his constitutional rights were not violated by the trial court's penalty-phase jury instructions. Although Buell presents three challenges to the penalty-phase jury instructions, only Buell's *Caldwell* claim, the first of his three challenges, was fairly presented to and considered by the Ohio appellate courts. As a result, Buell has procedurally defaulted his two additional claims. Each of Buell's claims will be analyzed, however. None have merit.

#### a. Instructions at Outset of Penalty Phase

Buell's first challenge is to the trial court instructions to the jury at the outset of the penalty-phase of Buell's trial. Specifically, Buell takes issue with the following instructions:

> the jury will be asked to make a recommendation to the court as to the sentence to be imposed on the defendant on the charge of Aggravated Murder

reviewing court in which the death penalty has been imposed, Ohio has properly acted within the wide latitude it is allowed.

Buell also argues that the use of the same underlying crime of kidnapping to elevate murder to aggravated murder and to make Buell eligible for the death penalty is unconstitutional. Buell asserts that under OHIO REV. CODE § 2929.04(A)(7), if a defendant commits murder during the commission of a felony, the felony can serve as an aggravating circumstance and the defendant can be convicted of capital murder without proof of an additional new factor. Buell argues that this scheme fails to "genuinely narrow the class of persons eligible for the death penalty and . . . reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder." *Zant*, 462 U.S. at 877.

In *Lowenfield v. Phelps*, 484 U.S. 231 (1988), the Supreme Court rejected an argument similar to Buell's regarding the jury's use of an aggravating circumstance, which was identical to an element of the capital crime of which the defendant was convicted, as the basis for imposing the death penalty. In *Lowenfield*, the sole aggravating circumstance found by the jury in its sentencing decision was identical to the underlying offense that the jury had already found in convicting the defendant. The Supreme Court concluded that this fact did not render the death sentence unconstitutional. The Court held that a state legislature may meet the narrowing requirement (1) by limiting the definition of capital offenses so that the narrowing function occurs at the guilt phase of trial, or (2) by more broadly defining capital offenses and providing for narrowing by jury findings of aggravating circumstances at the penalty phase of trial. *Id.* at 246. In *Lowenfield*, the Court stated that the narrowing requirement was met at the guilt phase of trial with the requirement that the jury find that the defendant had a specific intent to kill or to inflict great bodily harm upon more than one person. Since the narrowing occurred at the guilt phase, the fact that the penalty phase aggravating circumstance finding was duplicative did not make the sentence constitutionally infirm.

that a death penalty is constitutional if it "is imposed only after a determination that the aggravating circumstances outweigh the mitigating circumstances present in the particular crime committed by the particular defendant, or that there are no such mitigating circumstances." In Buell's case, both the jury at the penalty phase of trial and the reviewing courts specifically considering the aggravating circumstances and mitigating factors presented and determined that capital punishment was appropriate. By weighing these specific considerations, it cannot be said that a mandatory death penalty was imposed on Buell.

Buell's contentions regarding inadequate appellate review of the proportionality of death sentences under the Ohio statute fail because no proportionality review is constitutionally required. *See Pulley v. Harris*, 465 U.S. 37, 44-51 (1984). In addition, there is no constitutional requirement that a jury make specific findings authorizing the imposition of a death sentence, just as there is no constitutional right to jury sentencing. *See Hildwin v. Florida*, 490 U.S. 638, 640-41 (1989). However, under Ohio's scheme, the trial judge is given the statutory responsibility to reweigh the aggravating circumstances and mitigating factors before determining whether to impose a death sentence or a life sentence. OHIO REV. CODE § 2929.03(D)(3). Then, the trial judge must state his sentencing findings in a separate opinion. OHIO REV. CODE § 2929.03(F). As a result, the appellate courts have both the trial judge's sentencing opinion and the trial record for review. In addition, the Ohio Supreme Court has indicated that proportionality review is required under OHIO REV. CODE § 2929.05(A) to the extent that the reviewing court must consider cases already decided by the court in which the death penalty had been imposed. *See State v. Steffen*, 509 N.E.2d 383, 395 (Ohio 1987). Since proportionality review is not required by the Constitution, states have great latitude in defining the pool of cases used for comparison. *See Lindsey v. Smith*, 820 F.2d 1137, 1154 (11th Cir. 1987). By limiting proportionality review to other cases already decided by the

and

> [the defense has] the burden of going forward to present evidence concerning mitigating factors.

Buell claims that the first instruction stating that the jury verdict was a "recommendation" improperly diminished the jury's sense of responsibility for returning a death verdict. *See Caldwell v. Mississippi*, 472 U.S. 320, 328-29 (1985). Buell asserts that this portion of the instruction is misleading as to Ohio law. In addition, Buell states that while the defendant has the burden of going forward, pursuant to OHIO REV. CODE § 2929.03(D)(1), the state bears the burden of proof that the aggravating circumstances outweigh the mitigating factors in a capital murder trial, pursuant to OHIO REV. CODE § 2929.03(D)(2). Therefore, Buell claims that instructing the jury that the defendant had the burden of "going forward" without mentioning the state's burden of proof was misleading.

This claim is unavailing. It is an accurate statement of Ohio law for a trial judge to instruct a jury that their finding that a death sentence is warranted is a recommendation. It is specifically stated in OHIO REV. CODE § 2929.03(D)(2) that if the jury unanimously finds that aggravating circumstances outweigh mitigating factors "the trial jury shall recommend to the court that the sentence of death be imposed on the offender." The trial court has the discretion to accept or reject this recommendation since it must make the final determination of whether a death sentence is appropriate, according to OHIO REV. CODE § 2929.03(D)(3). Furthermore, the defense has the burden of presenting evidence concerning mitigating factors, as the trial court stated to the jury. Neither of the two contested instructions was contrary to Ohio law.

In *Caldwell*, the Court held that, "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." 472 U.S. at 328-29. The prosecutor in *Caldwell* told the jury that if it imposed a death

sentence on the defendant, its decision would be subject to appellate review, giving the jury the mistaken impression that the state appellate courts--not the jury itself--would make the final decision on the sentence to be imposed. *Id.* at 333. In decisions subsequent to *Caldwell*, the Supreme Court has reiterated that "[t]o establish a *Caldwell* violation, a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law." *Dugger v. Adams*, 489 U.S. 401, 407 (1989); *see also Scott*, 209 F.3d at 877. Unlike in *Caldwell*, where the jury was given the uncorrected impression that the appellate courts would make the final decision on the imposition of a death sentence, not merely review the appropriateness of the jury's decision to impose a death sentence, Buell has not demonstrated that the instructions at his trial improperly described the role assigned to the jury by local law. In instructing the jury that they are to make a recommendation as to a death sentence, and that the final decision regarding imposition of a death sentence rests with the trial court, the jury instruction complied with the letter of Ohio law and described with complete accuracy the jury's role in the sentencing process. By doing so, the jury's sense of responsibility was not diminished. Therefore, this claim must fail.

### b. Instructions Prior to Deliberations at Penalty Phase

Buell challenges six portions of the trial court's instructions to the jury prior to the commencement of deliberations at the penalty phase of trial.

First, Buell challenges the trial court's statement that "[t]he arguments of counsel are not evidence, but merely to assist you in your duty." Buell claims that this is contrary to OHIO REV. CODE § 2929.03(D)(1), which calls for the jury to consider and hear arguments of counsel. The district court concluded that the instruction set forth the proper legal standard. Nothing in OHIO REV. CODE § 2929.03(D)(1) indicates that the jury instruction was improper.

Second, Buell challenges the trial court's definition of mitigating factors: "These mitigating factors may include, but

option to choose a life sentence when only statutory aggravating circumstances have been proven or when mitigating factors are minimal. Buell claims that by limiting the sentencer's ability to return a life sentence only to those circumstances when aggravating factors fail to outweigh mitigating factors, Ohio's statute creates a mandatory death penalty. In addition, Buell argues that the statute prevents adequate proportionality review. Buell contends that the statute does not require identification of mitigating factors when a life sentence is imposed. Buell claims that this leads to no meaningful appellate review as no comparison can be made between life sentence and death penalty cases. Buell also asserts that Ohio courts do not follow OHIO REV. CODE § 2929.05, which requires Ohio appellate courts to "affirm a sentence of death only if the particular court is persuaded from the record that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors present in the case and that the sentence of death is the appropriate sentence in the case." Buell states that the appropriateness review conducted in each case is cursory and does not comport with the statutory requirements.

Buell's arguments are unavailing. In *Proffitt v. Florida*, 428 U.S. 242, 258 (1976), the Supreme Court upheld a statutory scheme for weighing aggravating circumstances against mitigating factors that is similar to Ohio's, which lays out specific aggravating circumstances and mitigating factors that are to be considered at sentencing. OHIO REV. CODE § 2929.04. The Court also has approved of a statute that did not enunciate specific factors to consider or a specific method of balancing the competing considerations. *See Franklin v. Lynaugh*, 487 U.S. 164, 172-73 (1988); *Zant v. Stephens*, 462 U.S. 862, 875 (1983). The Court has held that "it is constitutionally required that the sentencing authority have information sufficient to enable it to consider the character and individual circumstances of a defendant prior to imposition of a death sentence." *Sumner v. Shuman*, 483 U.S. 66, 72 (1987) (quoting *Gregg*, 428 U.S. at 189-90 n.38)). The sentence imposed on Buell complies with *Sumner* as well as the Supreme Court's holding in *Blystone*, 494 U.S. at 305,

### a. Constitutional Challenges to Ohio's Death Penalty Statute

Buell contends that Ohio's death penalty scheme allows for imposition of the death penalty in an arbitrary and capricious manner that violates constitutional guarantees of due process and equal protection. *See Furman v. Georgia*, 408 U.S. 238, 274 (1972). This argument was recently rejected in *Byrd*, 209 F.3d at 539. We note that the Ohio death penalty statute includes a number of capital sentencing procedures that the United States Supreme Court held in *Gregg v. Georgia*, 428 U.S. 153, 188-95 (1976), specifically to reduce the likelihood of arbitrary and capricious imposition of the death penalty. These procedures include: (1) consideration of a pre-sentence report by the sentencing authority; (2) jury sentencing where the jury is adequately informed and given meaningful standards to guide its use of the information; (3) a bifurcated guilt phase/sentencing phase trial; (4) weighing of aggravating circumstances and mitigating factors; (5) a sentencing decision based on specific findings; and (6) meaningful appellate review. In *Gregg*, the Court stated that the concerns expressed in *Furman* could be met by "a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." *Gregg*, 428 U.S. at 195. By complying with this requirement, the Ohio death penalty statute significantly reduces the likelihood of arbitrary and capricious imposition of the death penalty and does not run afoul of the Constitution.

Buell next attacks Ohio's requirements that the sentencing jury shall recommended the death penalty if it finds beyond a reasonable doubt that aggravating circumstances outweigh mitigating factors and that the appellate court shall affirm the sentence if it is persuaded that aggravating circumstances outweigh mitigating factors. OHIO REV. CODE §§ 2929.03(D)(2); 2929.05(A). Buell asserts that the Ohio statute does not specifically require the prosecution to prove the absence of *any* mitigating factors or that death is the only appropriate penalty. In addition, Buell argues that the Ohio scheme fails to provide the sentencing authority with an

are not limited to, the nature and circumstances of the offense, the history and background of the defendant, and any other factors which you may find exist from the evidence in mitigation of the sentence." This instruction is consistent with the Supreme Court's ruling in *Penry v. Lynaugh*, 492 U.S. 302, 328 (1989), in which the Supreme Court held that the jury "must be able to consider and give effect to any mitigating evidence relevant to a defendant's background and character or the circumstances of the crime."

Third, Buell challenges the trial court's instruction relating to Buell's unsworn statement introduced at the penalty phase: "In this case, there has been one witness and that was the unsworn statement of the defendant." This statement was a fair comment on the evidence. Furthermore, the statement did not restrict the jury from considering the testimony. Indeed, the judge later explicitly stated that the trial jury must consider all the evidence, including the unsworn statement of Buell.

Fourth, Buell challenges the trial court's statements instructing the jury to consider "all of the relevant evidence raised [during the guilt-phase portion of the trial]." Buell claims that this instruction misstates OHIO REV. CODE § 2929.03(D)(1), which states that the jury shall consider "any evidence raised at trial that is relevant to the aggravating circumstances the offender was found guilty of committing or to any factors in mitigation of the imposition of the sentence of death." While the jury instruction may be a truncation of the Ohio statutory section, Buell cannot demonstrate that it misstates the law or that it prejudiced him.

Fifth, Buell challenges the trial court's instruction that "[i]f all twelve of you find beyond a reasonable doubt that the aggravating circumstances which the defendant was found guilty of committing outweigh the mitigating factors, then you have no choice and must recommend to the court that the sentence of death be imposed upon defendant Robert A. Buell." Buell contends that this statement, particularly the phrase "you have no choice," creates a constitutionally

impermissible mandatory death penalty. The instruction is in full accord with OHIO REV. CODE 2929.03(D)(2), however. Moreover, the constitutionality of such an instruction was upheld by the Supreme Court in *Blystone v. Pennsylvania*, 494 U.S. 299, 305 (1990).

Sixth, Buell contends that statements in the jury instructions that a jury recommendation that the death penalty be imposed is only a recommendation and is not binding on the court had the effect of diminishing the jury's sense of responsibility. This contention fails for the same reasons that Buell's *Caldwell* claim fails.

### c. Court's Response to Jury Question During Penalty-Phase Deliberations

Buell's final challenge to the penalty-phase jury instructions relates to the trial court's response to a jury question about a non-unanimous sentencing verdict. During jury deliberations following the penalty phase of Buell's trial, the jury submitted to the trial court the following question written by one of the jurors: "May I ask the judge if I am undecided on one part and the others are in agreement, will this have any affect [sic] on the recommendation?" Upon receipt of this question, the trial court and counsel for the parties convened in chambers and discussed at length the appropriate response.[7] Buell's counsel indicated that "what [the juror] wants to know is if . . . she disagrees with the rest, what is the effect of an un-unanimous verdict." Buell's counsel stated "the law doesn't tell you what you do in certain circumstances, whether or not

---

[7] The judge and counsel were interpreting OHIO REV. CODE § 2929.03(D)(2), which states:

If the trial jury unanimously finds, by proof beyond a reasonable doubt, that the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors, the trial jury shall recommend the sentence of death be imposed on the offender. Absent such a finding, the jury shall recommend the offender be sentenced to one of the [life sentences].

used to find specific intent. *Cf. State v. Cotton*, 381 N.E.2d 190, 193 (Ohio 1978) ("The circumstances surrounding the firing of the non-fatal shots and the circumstances surrounding the firing of the last shot justify a finding of design."). This court has held that even erroneous instructions are not sufficient to demonstrate a violation of constitutional rights; rather, the instruction "must so infect the trial that the resulting conviction violates due process." *Brofford v. Marshall*, 751 F.2d 845, 856-57 (6th Cir. 1985) (citing *Henderson v. Kibbe*, 431 U.S. 145 (1977)). Buell is unable to demonstrate that this or any of the other contested instructions was erroneous, let alone that they rose to this higher constitutional standard necessary to prove a due process violation.

### 10. Challenges to Death Penalty under Constitutional and International Law

In his final ground for relief, Buell contends that the district court erred in denying his facial and as-applied challenges to Ohio's death penalty on the grounds that the punishment violates the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution and international law.

Buell can raise only those challenges to the constitutionality of capital punishment and Ohio's death penalty statute that he fairly presented on direct appeal to the Ohio appellate courts. The portions of Buell's claim challenging the death penalty as a violation of international law and electrocution as cruel and unusual punishment have not been presented previously by Buell to any state or federal court. These challenges are procedurally defaulted. Even if we review the merits of these arguments, we come to the same conclusion as we do in reviewing the arguments that Buell has preserved for review, which is that Ohio's death penalty violates neither the United States Constitution nor international law that binds the United States.

witness actually observed Buell. The court did not indicate any presumption that the witnesses observed Buell.

Second, Buell challenges the court's instruction regarding reasonable doubt. The court read the statutory definition of reasonable doubt set forth in OHIO REV. CODE § 2901.05(D)(1). This court has determined that Ohio's statutory definition of reasonable doubt does not offend due process. *See Thomas v. Arn*, 704 F.2d 865, 867-69 (6th Cir. 1983).

Third, Buell challenges the jury instruction regarding purpose. Buell contends that the charge contained a mandatory inference. The instruction stated: "The purpose with which a person does an act or brings about a certain result is determined from the manner in which it was done, the means used and all other circumstances in evidence." Buell argues that this instruction violates the Ohio statute on capital murder, which requires that an individual have specific intent to cause the death of another. Yet, Buell does not mention that the court developed the meaning of purpose more fully, including giving the instruction that "[a] person acts purposely when it is his specific intention to cause a certain result."

Fourth, Buell challenges the jury instruction regarding prior calculation and design. Buell claims that the jury instruction, "[i]f a wound is inflicted upon a person in a manner calculated to destroy life, purpose to kill may be inferred from that," was in direct conflict with the instruction that "no person may be convicted of aggravated murder unless he is specifically found to have intended to cause the death of another." Buell contends that the portion of the instruction giving the jury the ability to infer "purpose to kill" is in direct contradiction to the portion of the instruction stating the jury must find specific intent. The trial court's instruction is the precise charge contained in 4 Ohio Jury Instructions § 503.01(A). Moreover, the two statements are not inconsistent in that the manner in which a wound is inflicted can support an inference of a purpose to kill, which can be

it has to be unanimous as it relates to life. It only tells you as it relates to death."

The trial judge asked, "Do you think it's clear they have to reach a unanimous finding for life imprisonment?" Buell's counsel responded, "No. Death only. That has to be unanimous; and if they cannot reach a verdict on death, the remaining question is what is the penalty?" In the end, the trial judge decided to instruct the jury that "whichever verdict you reach must be unanimous." Buell's counsel objected, stating, "I think the only unanimous verdict has to be for capital punishment; and for that reason I object to that being read. I think what ought to be told is what they asked." The trial court stated to the jury: "Whichever verdict you reach, whether it's a recommendation of the death penalty or a recommendation of life imprisonment, the verdict must be unanimous."

Buell argues that the jury's question presented the same issue resolved by the Ohio Supreme Court in *State v. Brooks*, 661 N.E.2d 1030 (Ohio 1996) and that, had Buell's counsel raised the issue on appeal, the Ohio Supreme Court conceivably would have held, as it eventually did in *Brooks*, that the trial court should have answered the jury question in the following manner: "A solitary juror may prevent a death penalty recommendation by finding that aggravating circumstances in the case do not outweigh the mitigating factors." *Id.* at 1042.

To warrant habeas relief, "jury instructions must not only have been erroneous, but also, taken as a whole, so infirm that they rendered the entire trial fundamentally unfair. The burden is even greater than that required to demonstrate plain error on appeal." *Scott*, 209 F.3d at 882. Buell contends that the trial court erred in light of *Brooks* and that the court's error rose to such a level that it rendered his entire trial fundamentally unfair. Buell relies on this court's decision in *Mapes*, 171 F.3d at 413, in which this court ruled that, "[a]lthough the trial court did not have the benefit of *Brooks*, that case clearly establishes that the trial court misapplied

OHIO REV. CODE § 2929.03(D)(2) by requiring the jury to unanimously reject the death penalty before considering a life sentence." *Mapes*, 171 F.3d at 416-17. The *Mapes* court adopted the reasoning from *Brooks*, stating that "[i]f a juror believed his one vote could not affect the ultimate result, he might acquiesce in the death sentence. In this case, the jury instruction undermined the reliability of the jury verdict and risked erroneous imposition of the death sentence, thereby materially prejudicing Brooks's right to a fair trial." *Mapes*, 171 F.3d at 416 (quoting *Brooks*, 661 N.E.2d at 1042).

We note, however, that the jury instructions in *Brooks* and *Mapes* were not in response to jury questions, but were "acquittal first" instructions contained in general, penalty-phase jury charges. In both cases the jury was instructed that it must "determine unanimously that the death penalty is inappropriate before you can consider a life sentence." *Mapes*, 171 F.3d at 461; *Brooks*, 661 N.E.2d at 1040. Buell argues that the same principles can be applied to this case. We disagree.

In *Brooks*, the Ohio Supreme Court rejected the acquittal-first jury instruction and indicated that a jury need not rule out the death penalty before considering a life sentence. *Id.* at 1041-42. Consistent with this holding, the court made clear that a lone juror could prevent the imposition of the death penalty. *Ibid.* To the extent that Buell challenges the instruction given to the jury in this case, he is focused on the latter proposition rather than the former. Neither in answer to the juror's question nor in the jury instructions themselves, did the trial court state that the jury must rule out the death penalty before considering a life sentence. Instead, the court stated that whatever verdict the jury reached must be unanimous. What the trial court stated to the jury was not contrary to Ohio law. There is no specific language in OHIO REV. CODE § 2929.03(D)(2) limiting jury unanimity to only death recommendations. Morever, the trial court's instruction was in full accord with Ohio Criminal Rule 31(A), which requires that verdicts shall be unanimous. Ohio courts and this court have made it clear that *both* death and life sentences

drug dealers that the dealers and their drugs would not be tolerated in the jurors' community. *Id.* at 1148, 1153-55.

The prosecution's comments did not rise to the level of constitutional error. We must reject this claim.

### 9. Guilt-Phase Jury Instructions

Buell asserts that the district court erred in rejecting his claim that he was denied his constitutional right to due process as a result of errors in his guilty-phase jury instructions. At trial Buell did not object to the instructions he now challenges. According to Ohio Criminal Rule 30(A), a party cannot raise a claim of error related to jury instructions on appeal unless the party entered a specific objection to the instructions before the jury retired to consider its verdict. *See State v. White*, 709 N.E.2d 140, 158 (Ohio 1999). Buell also did not raise this issue on direct appeal or in post-conviction proceedings. Although this claim is procedurally defaulted, it also lacks merit.

Errors in jury instructions do not rise to the level of a constitutional violation unless the habeas petitioner can establish that the "instruction by itself so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973); *Scott*, 209 F.3d 854 at 872. Buell challenges four jury instructions given at the guilt phase of his trial. He claims that these instructions, in their totality, affected his trial to such an extent that his conviction violates due process.

First, Buell challenges the jury instruction regarding eyewitness identification. The court instructed the jury that "[i]n considering eyewitness testimony, you should consider the capacity and opportunity of the witness to observe the defendant . . . ." Buell asserts that the court failed to indicate to the jury which witnesses were giving eyewitness testimony. He argues that the instruction presumed that the witnesses had the opportunity to observe Buell. As the State points out, however, the jury was required to consider whether the

prosecutor's opinion as to what Buell's sentence should be was not prejudicial. The jury heard the evidence and the court's instructions on the law and was able to make an intelligent decision as to the ultimate outcome of the case."

Finally, Buell objects to the prosecution's statement that the jury should "send a message to the Robert Buells of the world" that "if you're going to commit this kind of a crime then you better be expecting to pay the ultimate price, yourself." This court has held on several occasions that similar statements were not prejudicial. *See United States v. Reliford*, 58 F.3d 247, 250-51 (6th Cir. 1995) (holding that prosecutor's statement that jury should "return a verdict that tells the defendant . . . that the citizens of the Western District of Tennessee won't tolerate these types of crimes" was not prejudicial); *United States v. Alloway*, 397 F.2d 105, 113 (6th Cir. 1968) (holding that defendant was not prejudiced when prosecutor stated: "You the jurors, are called upon in this case to be the world conscience of the community. And I'm calling on this jury to speak out for the community and let the John Alloways know that this type of conduct will not be tolerated, that we're not going to tolerate . . . .").

In distinguishing *Alloway* from a situation in which a prosecutor's comments were deemed prejudicial because they gave jurors the impression that the drug trade would continue in the jurors' community if they did not convict, this court stated that the prosecutor in *Alloway* did "not go beyond a mere allusion to the general need to convict guilty people . . . and bring to bear upon the jury's deliberations the attendant social consequences of defendant's criminal conduct or urge the jury to convict an individual defendant in an effort to ameliorate society's woes." *United States v. Solivan*, 937 F.2d 1146, 1154 (6th Cir. 1991). We believe the same can be said of the prosecutor's comments in this case. The prosecutor's comments were a general statement regarding the need to convict people who commit sexual molestation and murder. The prosecutor was not making a statement regarding the jury's ability to address a specific societal problem as the prosecutor did in *Solivan* by stating that the jurors could tell

must be unanimous under Ohio law and that jury instructions to that effect are not unconstitutional. *Scott*, 209 F.3d at 876 ("*Brooks* did not hold that all instructions requiring unanimous recommendations of life or death in previously decided Ohio death-penalty cases were unconstitutional."); *State v. Jenkins*, 473 N.E.2d 264, 307 (Ohio 1984) ("we conclude in returning a sentence of life imprisonment under R.C. 2929.03(D)(2), the jury's verdict must be unanimous").

The focus of Buell's claim is not on what the trial court stated to the jury, but rather, on what the court did *not* state to the jury. Buell contends that the trial court erred by not instructing the jury that if they could not come to a unanimous verdict they should advise the court of that fact and that the court would then determine the appropriate sentence. Buell bases this claim on the Ohio Supreme Court's opinion in *Brooks*, issued twelve years after Buell's trial, in which the court concluded that jurors must be instructed "from this point forward" that "a solitary juror may prevent a death penalty recommendation by finding that the aggravating circumstances in the case do not outweigh the mitigating factors." 661 N.E.2d at 1042. Buell's claim fails for several reasons.

First, Buell is unable to demonstrate any basis in Ohio law for the instruction that he believes should have been given to the jury, an instruction that is distinct from that mandated in *Brooks*. In *Brooks*, the Ohio Supreme Court reaffirmed that the jury's determination that a life sentence is appropriate must be unanimous and that a jury should be instructed of that fact. 661 N.E.2d at 1042 (stating that Ohio statutes and past cases could be made consistent "through a jury instruction which requires the jury, when it cannot unanimously agree on a death sentence, to move on in their deliberations to a consideration of which life sentence is appropriate, *with that determination to be unanimous*" (emphasis added)). The court addressed only a jury's inability to come to a unanimous decision as to a recommendation regarding a death sentence, not a jury's inability to come to a unanimous decision as to a

recommendation regarding a life sentence or, in effect, any sentence.

Second, to the extent that Ohio law after *Brooks*, 661 N.E.2d at 1042, now requires an instruction regarding a lone juror's ability to prevent the imposition of the death penalty, we have held that this requirement "is prospective only." *Scott*, 209 F.3d at 876.

Third, even if the *Brooks* requirement were to apply retroactively to Buell's case, the failure of the trial court to give such an instruction would be an error under state law that does not provide a basis for habeas relief. *See Estelle*, 502 U.S. at 71-72.[8]  This court has held that it "does not necessarily mislead a jury regarding its role to avoid disclosing what will happen if the jury fails to achieve unanimity." *Coe v. Bell,* 161 F.3d 320, 339 (6th Cir. 1998). Furthermore, in *Jones v. United States*, 527 U.S. 373 (1999), the Supreme Court discussed the consequence of the district court denying a petitioner's request for a jury instruction on the consequences of a jury deadlock in the context of the Federal Death Penalty Act of 1994, 18 U.S.C. § 3591. The Court held that the Constitution does not require that a jury in every capital case be instructed as to the consequences of a breakdown in the deliberative process. *Jones v. United States*, 527 U.S. at 382-83. Furthermore, the Court noted that various Courts of Appeals, including this court in *Coe*, have rejected a constitutional unanimity requirement or a requirement of a jury instruction as to the consequences of a breakdown in the deliberative process. *Id.* at 382. n.6.

---

[8]We also note that to the extent that *Mapes* followed *Brooks*, it simply stated in dicta (having found that the petitioner's claim was procedurally defaulted) that "the trial court misapplied Ohio Revised Code § 2929.03(D)(2) by requiring the jury to unanimously reject the death penalty before considering a life sentence." 171 F.3d at 416-17. *Mapes*, therefore, is inapplicable to this case for two reasons: (1) the trial court in this case did not impose a requirement that the jury unanimously reject the death penalty before considering a life sentence and (2) *Mapes* did not address whether it was necessary for the court to have given an instruction that a sole juror could prevent a death sentence.

direct appeal or his post-conviction petition.  As a result, Buell has procedurally defaulted this claim.  A review of the merits of the claim nevertheless indicates that the alleged prosecutorial misconduct did not deprive Buell of his constitutional rights.

In order for habeas relief to be granted, a prosecutor's conduct must be so egregious as to render the petitioner's trial fundamentally unfair.  *See United States v. Young*, 470 U.S. 1, 11-12 (1985); *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974); *Byrd*, 209 F.3d at 529.  This determination must be made by considering the totality of the circumstances of each case.  *See Byrd*, 209 F.3d at 529-30.

Buell catalogs a variety of conduct and comments by the prosecutors at his trial, some of which restate claims Buell has already raised.  First, Buell argues that before trial commenced, the prosecution withheld discoverable evidence that three of the State's witnesses had been hypnotized and that one of the witnesses had mental defects.  This forms the basis for Buell's sixth claim, which this court has rejected. Second, Buell asserts that the prosecutors misled potential jurors during *voir dire* by stating that their sentencing decision was only a recommendation to the jury.  This relates to Buell's third claim, which this court has rejected.  Third, Buell argues that the prosecution made numerous improper comments during closing argument.  Buell asserts that the prosecution instructed jurors to disregard mitigation evidence. Yet none of the comments that Buell points to explicitly state this.  Instead, the prosecution repeatedly argued that the mitigating factors did not outweigh the aggravating circumstances.  In addition, the prosecution referred to and described the aggravating circumstances.  The statements indicate that the prosecutors were not engaging in misconduct but simply doing their job.

Buell also alleges that a prosecutor improperly injected his personal opinion regarding an appropriate sentence for Buell by stating that the jury should impose the death penalty.  We agree with the district court's conclusion that "[t]he

Buell provides no legal basis for why his presence at the meeting was required. Buell argues that the jury deliberations were tainted by the identification of the carpet samples and that "[u]nlike the lawyers, he may well have appreciated the contamination of the jury that had taken place." Yet Buell does not explain how the jury deliberations were tainted or contaminated. The jury was given the source of the identifications for each of the carpet fibers except the ones gathered from the other incident. The court told the jury that the identification for the additional fibers was "a laboratory marking which you should disregard." The meeting between the judge and counsel was for the purpose of identifying the samples, which the parties did, in answer to the jury's questions. To the extent that one of the exhibits the jury reviewed included carpet samples not related to the crime for which Buell was being tried, the jury was not made aware of this fact and was told to disregard those samples. Buell's counsel agreed to the identifications. Moreover, Buell does not contend that this response was in error or was improper.

The cases cited by Buell are not applicable to this situation, as each relates to jury instructions. In those situations, courts held that a defendant must be present in order to voice objections to the instructions given to the jury. *See Fillippon v. Albion Vein Slate Co.*, 250 U.S. 76, 81 (1919); *Evans v. United States*, 284 F.2d 393, 394-95 (6th Cir. 1960); *Jones v. State*, 26 Ohio St. 208, 209 (Ohio 1875). A meeting similar to a bench conference at which the trial judge and counsel identified carpet samples is not sufficiently similar to jury instructions such that Buell's presence was required. Furthermore, Buell's counsel agreed to the answer given to the jury. Buell's absence from this proceeding did not violate his constitutional rights.

### 8. Prosecutorial Misconduct

Buell challenges the district court's decision rejecting his claim that he was denied his constitutional rights as a result of prosecutorial misconduct. Buell did not object to the prosecution's remarks at trial, nor did he raise the claim in his

### 4. Exclusion of Expert Testimony on Eyewitness Identification

Buell challenges the district court's finding that the trial court's decision to exclude the testimony of Steven Penrod, an expert in eyewitness identification, regarding the credibility of an identification witness did not rise to the level of constitutional error. This claim was not procedurally defaulted, as it was raised and addressed on direct appeal as Buell's first assignment of error in both the Ohio Court of Appeals and Ohio Supreme Court.

The trial court's decision to exclude expert testimony is an exercise of judicial discretion. *See United States v. Harris*, 192 F.3d 580, 588 (6th Cir. 1999). Moreover, as Buell himself recognizes, habeas review does not ordinarily extend to state court rulings on the admissibility of evidence. *See Burgett v. Texas*, 389 U.S. 109, 113-14 (1967); *Fuson v. Jago*, 773 F.2d 55, 59 (6th Cir. 1985); *Bell v. Arn*, 536 F.2d 123, 125 (6th Cir. 1976). Buell claims, however, that this error deprived him of fundamental constitutional guarantees under the Fifth, Sixth, Eighth, and Fourteenth Amendments, such that a federal court must inquire into the state ruling on habeas review. *See Fuson*, 773 F.2d at 59; *Bell*, 536 F.2d at 125. The State correctly points out in response that "errors of state law, especially errors based on a trial court's evidentiary rulings, do not, in and of themselves, violate the constitution." *Neumann v. Jordan*, 84 F.3d 985, 988 (7th Cir. 1996); *see also Lundy*, 888 F.2d at 473.

Buell asserts that the trial court's decision to exclude Penrod's testimony violated Buell's rights at both the fact-finding and penalty phases of his trial. With regard to the fact-finding phase, Buell states that three witnesses claimed to have seen Buell in a ballpark one week before Harrison's abduction, two witnesses claimed to have seen him in the park on the day Harrison was kidnapped, and one claimed to have seen him leaving the site where the body was found.

Buell states that two of the three witnesses from the ballpark identified Buell only after seeing him on television

and in the newspaper sixteen months after he was supposedly at the ballpark. Buell notes that the two eyewitnesses from the park gave similar descriptions of the kidnapper but could not identify Buell in court. The witness who claimed to have seen Buell leaving the site where the body was found claimed to have seen a man driving a raspberry-colored car. The witness's observation was limited to five seconds as his pickup truck passed the car. The witness identified Buell after seeing him on television and being shown a picture of a van, Buell, and a car.

Penrod intended to testify as to the factors involved in the mental processes of identifications and to render his opinion about the accuracy and credibility of the specific identification testimony of the witnesses. The trial court denied the request, stating: "It's the Court's opinion that the jury can make the determination on who to believe and who not to believe, using the test that I will describe to them, using their common sense, and they do not need an expert to help them do that."

On appeal, the Ohio Supreme Court stated that "the expert testimony of an experimental psychologist regarding the credibility of the identification testimony of a *particular* witness is inadmissible under Evid. R. 702, absent a showing that the witness suffers from a mental or physical impairment which would affect the witness's ability to observe or recall events." *State v. Buell*, 489 N.E.2d at 804 (emphasis added).[9] In addition, the court found that "the evidence of the defendant's guilt was based primarily on physical evidence rather than identification testimony. In light of the substantial physical evidence, it cannot be said that 'it is more probable than not that the [exclusion] affected the verdict.'" *Ibid.* (internal citations omitted). We agree with the Ohio Supreme

---

[9] Buell argues that this language becomes important when it was later discovered that one of the witnesses about whom Penrod intended to testify received treatment at a mental health center. *See infra* Section III.B.6. However, at most, this is an error of state law that is not cognizable on habeas review. *See Estelle*, 502 U.S. at 67-68.

### 7. *Presence at Critical Stages of Trial*

Buell takes issue with the district court's rejection of his claim that he was deprived of his right to be present at all critical stages of his trial. Buell has procedurally defaulted this claim. At trial, Buell did not request to be present for the meetings in chambers for which he now claims he should have been present. In addition, the claim was not included in Buell's direct appeal, nor in his post-conviction petition. Even if we look to the substance of this claim, however, it is meritless.

The Supreme Court has recognized that "a defendant is guaranteed the right to be present at any stage of the criminal proceeding that is critical to the outcome if his presence would contribute to the fairness of the procedure." *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987). The Court stated that it must be shown that the presence "would have been useful in ensuring a more reliable determination." *Id.* at 747.

The conference in chambers at which Buell claims he should have been present related to a graph prepared by Agent Alan Roubillard of the FBI that included carpet fiber samples from Buell's home and van and samples from a bedspread found at the same time as the victim's body. Roubillard testified that "there were several items that I also examined in this case and they appear on this chart and you can see that they fall right into the same absorption." The jury questioned some of these unidentified additional samples, specifically asking where they were found. In chambers, in answer to a question for the trial court judge, the prosecution indicated that some of the samples about which the jury inquired were gathered in an investigation relating to another crime.

The jury questions were resolved in what the State asserts was a proceeding "akin to a bench conference." Counsel for both Buell and the State were present at the meeting. They discussed and agreed to an identification of the carpet samples. Buell's counsel specifically agreed to the answer given to the jury.

an unnamed young woman was also hypnotized. Second, the Ohio Court of Appeals stated that the post-hypnotic information from Wilson was essentially the same as the pre-hypnotic information Wilson supplied to the police. The court indicated that there was no admission of hypnotically refreshed testimony that was of any significance. Third, the Court of Appeals concluded that even if the hypnotically refreshed testimony of Middleton was eliminated from consideration, there was sufficient evidence to constitute overwhelming proof of Buell's guilt. We agree. Substantial physical evidence supported Buell's conviction. In addition, Wilson's testimony, which was not substantially affected by his hypnosis, and circumstantial evidence relating to the manner in which the crime was committed also contributed to Buell's conviction. Neither the disclosure that witnesses had been hypnotized nor the suppression of hypnotically refreshed testimony would have created a reasonable probability that the result of Buell's trial would have been different.

We also reject Buell's argument regarding Wilson's brief treatment at a mental health facility. We note that in denying Buell's ineffective assistance of trial counsel claim predicated on trial counsel's failure to discover Wilson's mental condition, the Ohio Court of Appeals indicated that Wilson's testimony helped rather than hurt Buell since Wilson, the only eyewitness to the abduction, had trouble identifying Buell, failing to pick him out of a photo array of suspects. As a result, the Court of Appeals determined that Buell's counsel was not ineffective for failing to discover information regarding Wilson's mental state. In a similar way, the disclosure of Wilson's mental state would not have created a reasonable probability that the result of Buell's trial would have been different. Wilson's testimony already had indicia of unreliability, yet the jury still found Buell guilty and assigned the death penalty. Buell has not demonstrated that, even if the jury or the defense knew of Wilson's brief treatment at a mental health center, there is a reasonable probability that the outcome of his trial would have been different.

Court and conclude, upon the review of the evidence presented at Buell's trial, that the exclusion of Penrod's testimony did not affect Buell's constitutional rights.

As to the penalty phase of the trial, Buell notes that OHIO REV. CODE § 2929.03(D)(1) provides that "[t]he defendant shall be given great latitude in the presentation of evidence of the mitigating factors set forth in division (B) of section 2929.04 of the Revised Code and of any other facts in mitigation of the sentence of death." Buell states that his defense counsel made a tactical decision not to present mitigating evidence regarding Buell's past, relying instead on residual doubt. Buell argues that the expert testimony should have been allowed as a form of mitigating evidence relating to residual doubt.

Buell provides no legal support for the claim that Penrod's expert testimony is a type of "fact[] in mitigation of the sentence of death" contemplated under OHIO REV. CODE § 2929.03(D)(1). All of the factors set forth in § 2929.04, which § 2929.03(D)(1) cross-references, concern "the nature and circumstances of the offense, [and] the history, character, and background of the offender" and are to be considered as mitigating evidence to determine whether the death penalty should be imposed. Penrod's testimony relates to eyewitness identification that concerns whether Buell committed the offense for which he was found guilty. The testimony does not concern a mitigating factor that should be considered after a finding of guilt is made. Indeed, this court recently noted that Ohio law does not recognize residual doubt, the basis for which Buell claims that Penrod's testimony should have been admitted, as an acceptable mitigating factor:

> Our system requires that the prosecution prove all elements of a crime beyond a reasonable doubt. Therefore, it is illogical to find that the defendant is guilty beyond a reasonable doubt, yet then doubt the certainty of the guilty verdict by recommending mercy in case a mistake has occurred. Residual doubt casts a shadow over the reliability and credibility of our legal

system in that it allows the jury to second-guess its verdict of guilt in the separate penalty phase of a murder trial. . . .

*Residual doubt is not an acceptable mitigating factor under R.C. 2929.04(B), since it is irrelevant to the issue of whether the defendant should be sentenced to death.*

*Coleman v. Mitchell*, 244 F.3d at 544 (quoting *State v. McGuire*, 686 N.E.2d 1112, 1123 (Ohio 1997)).

Buell is unable to demonstrate that the exclusion of Penrod's testimony at either the guilt phase or the penalty phase of his trial rose to the level of constitutional error. Moreover, this court has recognized that a habeas petitioner does not have a constitutional right to the presentation of expert testimony on the reliability of eyewitness identification. *See Moore v. Tate*, 882 F.2d 1107, 1110 (6th Cir. 1989). The court in *Moore* noted that the examination and cross-examination of a particular witness at trial afforded the jury an adequate opportunity to assess the reliability of the witness's identification of the defendant. *Id.* at 1111. The court concluded that "while the expert's testimony may well have given the jurors another perspective from which to assess [the eyewitness'] testimony, we do not believe that this perspective was constitutionally required. *Ibid.* Although, as Buell points out, *Moore* did not involve a bifurcated trial, this fact does not affect its applicability to this case since no constitutional error arose either at the guilt phase or the penalty phase of Buell's trial by the exclusion of Penrod's testimony.

### 5. *Ineffective Assistance of Counsel*

Buell claims that the district court erred in rejecting his claims of ineffective assistance of trial and appellate counsel. Buell chose not to pursue an ineffective assistance of trial counsel claim on direct review. Buell included an ineffective assistance of trial counsel claim in his post-conviction petition. Since Buell was represented by the same counsel at trial and on direct appeal, it was proper for him to raise his

proceeding would have been different. A 'reasonable probability' is a probability sufficient to undermine confidence in the outcome." *United States v. Bagley*, 473 U.S. 667, 682 (1985).

Buell contends that the trial court committed constitutional error in its finding that the failure of prosecutors to tell Buell's attorneys that three witnesses had been hypnotized was "negligent and not in any way intentional." Buell asserts that the prosecution acted intentionally, pointing to evidence indicating that the prosecution was aware that the information existed. The motives of the prosecution are not the subject of our inquiry, however. The Supreme Court instructs us that our review must focus on whether "the evidence is material either to guilt or punishment, *irrespective of the good faith or the bad faith of the prosecution*." *Brady*, 373 U.S. at 87 (emphasis added).

Buell contends that this information was material. He states that Roy Wilson's observations at the time of Krista Harrison's abduction were the only evidence placing Buell and his van at the scene. In addition, Buell asserts that Wilson's testimony was corroborated by the testimony of Stephanie Baker, another witness who allegedly was hypnotized. Buell argues that if the prosecution had provided him with this evidence, there is a reasonable probability that he would have conducted different trial preparation and cross-examination and the outcome of the trial could have been different.

We agree with the reasoning of the Ohio Court of Appeals, which concluded that the hypnosis of the witnesses did not affect the result of Buell's trial. First, the Ohio Court of Appeals disputed the trial court's conclusion that Baker was hypnotized. The Court of Appeals indicated there is no evidence in the record that Baker was hypnotized. We note that in his brief to this court, Buell does not point to any evidence in the record specifically indicating that Baker was hypnotized, but instead, he simply relies on the testimony of two police officers at the post-conviction hearing stating that

### 6. Withholding of Evidence

Buell asserts that the district court erred in rejecting his claim that he was prejudiced by the State withholding evidence that three trial witnesses were hypnotized. This claim was properly presented and considered by the Ohio courts in post-conviction proceedings. Buell also now contends that the State failed to disclose evidence regarding witness Roy Wilson's mental capacity. This claim was not raised in Buell's direct appeal or his post-conviction petition, although Buell was aware of this claim when he pursued his post-conviction remedies since he argued at the time that his trial counsel was ineffective in investigating Roy Wilson's mental state. We agree with the State that Buell's post-conviction ineffective assistance of counsel claim does not constitute a fair presentation of the underlying claim for federal habeas purposes. Even if we overlook Buell's procedural default and review this claim, however, it lacks merit.

Buell states that three witnesses were hypnotized during the course of the investigation regarding Krista Harrison's murder: Roy Wilson, Stephanie Baker, and Donald Middleton. In addition, Buell states that during the course of post-conviction proceedings, it was learned that Wilson, who was eleven at the time of Krista Harrison's abduction, had been treated briefly at a mental health center. Records at the institution where Wilson was treated indicate that he suffered from an adjustment disorder, disturbance of conduct, and borderline intellectual functioning.

Buell argues that the suppression of this evidence violates *Brady v. Maryland*, 373 U.S. 83 (1963). In *Brady*, the Supreme Court stated that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or punishment, irrespective of the good faith or bad faith of the prosecution." *Id.* at 87. Evidence is considered material "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the

---

ineffective assistance of trial counsel claims initially in his post-conviction petition. *See Cole*, 443 N.E.2d at 171. Therefore, these claims were not defaulted and are preserved for habeas review.

In *Strickland*, 466 U.S. at 686, the Supreme Court held that "the benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." The defendant must show that counsel's performance was deficient and that the performance prejudiced the defense. *Id.* at 687. With regard to showing prejudice, the Supreme Court later stated that the component, "focuses on the question whether counsel's deficient performance renders the result of the trial unreliable or the proceeding fundamentally unfair." *Lockhart v. Fretwell*, 506 U.S. 364, 372 (1993). However, this court has noted that under *Strickland*, strategic choices by defense counsel are "virtually unchallengeable." *Meeks v. Bergen*, 749 F.2d 322, 328 (6th Cir. 1984).

Buell refers this court to a catalog of specific instances of alleged ineffective assistance of his trial counsel contained in the seventeenth claim in Buell's habeas petition. Buell states that "significant examples" include counsel's failure to (1) interview witnesses Wilson, Baker, and Middleton before trial; (2) learn that they had been hypnotized by law enforcement agents; and (3) learn that Wilson had undergone mental treatment. Buell asserts that the prosecution's failure to disclose this information created a *Brady* violation (Buell's sixth claim), but he also argues that his lawyers should have obtained this information themselves. Buell notes that his trial counsel was furnished with the witnesses' names and addresses in pretrial discovery and knew the witnesses went through extensive pretrial identification procedures with investigators and would be asked to make in-court identifications. Buell asserts that his trial counsel knew that they would have to challenge the in-court identifications and that therefore, their lack of preparation to confront these witnesses was constitutionally deficient.

Buell also contends that his counsel's failure to investigate mitigating evidence constitutes ineffective assistance, since failure to investigate Buell's background and develop evidence "produced the scanty penalty phase hearing mitigating [evidence]."

Buell asserts that his trial counsel's decisions "cannot be explained away as trial strategy." He notes that in *Strickland*, the Court stated that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U.S. at 691. This argument is especially faulty, though, because the precise language quoted by Buell indicates that there should be "a heavy measure of deference to counsel's judgments." *Ibid.* The bulk of allegations that form the basis of Buell's claims of ineffective assistance of trial counsel concern judgments that his counsel made during the course of their representation of Buell at trial. They do not rise to the level of constitutional ineffectiveness. This is highlighted by the inconsistencies in Buell's own arguments. To support his fourth claim, that the trial court improperly excluded expert testimony regarding eyewitness identification, Buell asserted that "defense counsel made a tactical decision to not present mitigating evidence regarding Buell's past, relying instead on residual doubt." Buell now argues this his trial counsel was ineffective by not conducting investigations necessary to present compelling mitigating evidence. Buell cannot have it both ways. As this court has noted, tactical decisions are "virtually unchallengeable." *Meeks*, 749 F.2d at 328. Both the trial court and the Ohio Court of Appeals found as a factual matter that Buell's counsel performed an extensive pre-trial investigation. To the extent that Buell believes his counsel should have undertaken a different strategy in conducting the investigation and determining how best to advocate on Buell's behalf, these are tactical decisions that cannot form the basis for an ineffective assistance claim.

The great bulk of Buell's allegations concern strategic decisions that do not amount to constitutionally deficient performance. With regard to the primary claim to which Buell directs this court's attention, his allegations concerning counsel's investigation of witnesses Wilson, Barker, and Middleton, we note that Buell's counsel reviewed the statements of these witnesses before trial. Moreover, Buell is unable to demonstrate how the lack of interviews conducted by his counsel made his trial fundamentally unfair. With regard to Buell's claim that his defense counsel failed to discover that these witnesses were hypnotized and that one witness had undergone mental treatment, we conclude that even if the actions of Buell's counsel were considered deficient, he not was not prejudiced for the reasons we discuss below in rejecting Buell's sixth claim. In the end, Buell is unable to demonstrate how his trial counsel's performance was deficient and prejudiced his defense.

Buell also presents various claims of ineffective assistance of appellate counsel. These claims were not defaulted for the reasons we discussed above in reviewing Buell's second claim.

Buell argues that his appellate counsel was ineffective both during his direct appeal and his post-conviction proceedings. Buell asserts that he was prejudiced by failure of his appellate counsel to raise the issues cataloged as claims twenty-seven and thirty-two in his habeas petition. Buell stresses his appellate counsel's failure to appeal the trial court's response to the jury's unanimity question, a response to which Buell's counsel made a contemporaneous objection. In addition, he specifically discusses his appellate counsel's failure to appeal the trial court's decision not to admit the expert testimony Buell presented regarding eyewitness identification. Even if Buell's appellate counsel was deficient in failing to raises these claims, we have demonstrated that Buell was not prejudiced by our rejection of Buell's third and fourth claims in this appeal. Buell cannot support a claim of ineffective assistance of appellate counsel.